UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

* * * * * * * * * * * * * * * * * * *

Kathleen A. Johnson,

        Plaintiff,

vs.                       REPORT AND RECOMMENDATION

Michael J. Astrue,[1]
Commissioner of Social
Security,

        Defendant.      Civ. No. 06-3213 (MJD/RLE)

* * * * * * * * * * * * * * * * * * *

I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the Commissioner's

final decision which denied her application for Childhood Disability Benefits ("CDB"),

and Supplemental Security Income ("SSI").  The matter is now before the Court upon

the parties' cross-Motions for Summary Judgment.  The Plaintiff has appeared by

Edward C. Olson, Esq., and the Defendant has appeared by Lonnie F. Bryan,

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security, and pursuant to Rule 25(d)(1), Federal Rules of Civil Procedure, we have substituted him as the named Defendant.

Assistant United States Attorney.  For reasons which follow, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's Motion be denied.

## II. <u>Procedural History</u>

The Plaintiff protectively filed an application for CDB,[2] which was based upon her father's Social Security record, on April 25, 2003, [T. 14, 59-61, 68], and applied for SSI on May 2, 2003, at which time, she alleged that she had been disabled since May 18, 1982, which was the date of her birth.  [T. 14, 195-97].

The State Agency denied these claims upon initial review, and upon reconsideration.  [T. 30-35; 38-42].  The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on May 24, 2005, a Hearing was conducted, at which time, the Plaintiff appeared personally, and by an attorney.  [T. 215-39].  Thereafter, on October 14, 2005, the ALJ issued a decision denying the

---

[2]Under 20 C.F.R. §404.350, a claimant is entitled CDB if the claimant is an insured person's child, is dependent upon the insured, applies for the benefits, is unmarried, is eighteen (18) years old or older, and has a disability that began before the claimant became twenty-two (22) years old.  Here, the only element of entitlement that is in dispute is whether the Plaintiff is disabled.  Accordingly, the issues under CDB, and SSI, conflate on the issue of disability, and we do not otherwise separately address the CDB issues.

Plaintiff's claim for benefits.   [T. 11-22].   On November 23, 2005, the Plaintiff

requested an Administrative Review before the Appeals Council, [T. 10], which, on

June 2, 2006, denied the further review.   [T. 5-7].   Thus, the ALJ's determination

became the final decision of the Commissioner.   See, Grissom v. Barnhart, 416 F.3d

834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d 1124, 1125 (8th Cir. 1998); Johnson

v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §416.1472.

### III.   Administrative Record

A.   Factual Background.   The Plaintiff was twenty-two (22) years old at the

time of the Hearing.   [T. 14, 195].   She was a right-handed high school graduate with

no past relevant work, [T. 21, 80, 94, 120], although she stated that she earned $25.00

per week performing caretaking duties for a woman with multiple sclerosis.   [T. 75].

The Plaintiff alleges that she cannot work full time due to anxiety, agoraphobia, and

depression.   [T. 74, 195-97].

1.   Medical Records.   On March 13, 1998, the Plaintiff was examined

by Dr. Bart Main.   [T. 183-84].   Dr. Main noted that the Plaintiff was attending one (1)

hour of class per day, and had previously had trouble with class attendance.   [T. 183].

Dr. Main diagnosed the Plaintiff with "classic agoraphobia with panic attacks," [T.

104], and assigned her a Global Assessment of Functioning ("GAF") score of 65.[3] [T. 181].  At the request of the Plaintiff's mother, Dr. Main signed a form that would allow the Plaintiff to be home schooled.  [T. 184].

In December of 2001, the Plaintiff was brought to the emergency room by her family, when she became delusional, had slurred speech, was hallucinating, and complained of chest pain. [T. 133].   Treatment notes described the Plaintiff's symptoms as evidence of a possible temporal lobe seizure, [T. 124], or psychotic break, [T. 133], although a CT scan of her head was normal. [T. 139].  The Plaintiff's symptoms resolved while she was at the hospital, and she was released to the care of her family after refusing to receive psychiatric treatment.  [T. 127, 135].  Discharge notes recorded her mood as alert, oriented, calm, and cooperative.  [T. 127].

---

[3]The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental Disorders, (4th Ed., Text Revision, 2000), at 34.  On a 100 point scale, a rating of 41-50 represents serious symptoms or any serious impairment in social, occupational, or school functioning; a rating of 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning; and a rating of 61-70 represents some mild symptoms, or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and having some meaningful interpersonal relationships.  Id.

On March 20, 2003, the Plaintiff was seen by Dr. Walid Mikhail, who noted that the Plaintiff complained that she had a history of anxiety and depression that was getting "worse over the last several months," as she was afraid to leave her home, and suffered from "panic attacks that are unexpected and classic." [T. 150].  Dr. Mikhail diagnosed the Plaintiff as having a panic disorder with agoraphobia, and a depressive disorder, and prescribed medication.  Id.  In April of 2003, the Plaintiff began treatment with a social worker, Richard E. Close, and the Plaintiff, as well as her mother, reported improved energy and elimination of suicidal thoughts, although her agoraphobic symptoms remained undiminished.  [T. 149].  On April 7, 2003, Dr. Mikhail noted that the Plaintiff was "doing wonderful" on Celexa,[4] and was "happy and interactive." [T. 148].  Close also noted improvement in the Plaintiff's mood and functioning, in his treatment notes from May 28, 2003, and recorded that the Plaintiff reported no suicidal thoughts.  [T. 146].

The Plaintiff saw Dr. Mikhail in June of 2003, who found that her mood was "very stable," and posited that her depression was in remission.  [T. 145].  In January of 2004, Dr. Mikhail noted that the Plaintiff continued to do well on Celexa, was

---

[4]Celexa is "indicated for the treatment of depression."  Physician's Desk Reference, p. 1178 (60th ed. 2006).

working four (4) hours per day, and felt that her life was "markedly improved."  [T. 180].  Dr. Mikhail examined the Plaintiff, again, in November of 2004, noted that she had a very low IQ, and suggested that she would benefit from counseling.  [T. 179].

       2.    <u>Evaluations</u>.  In connection with her application for SSI, the Plaintiff was evaluated by Dr. Donald E. Wiger on August 8, 2003.  [T. 153-57].  Dr. Wiger found the Plaintiff to be relaxed and alert, with clear speech and a normal vocabulary.  [T. 154].  Dr. Wiger noted that the Plaintiff displayed normal intellectual functioning, and he diagnosed the Plaintiff as having a panic disorder with agoraphobia, dysthemia, a history of major depression with most symptoms in remission, and a GAF of no more than 50.  [T. 156].  Dr. Wiger opined that the Plaintiff would be able to understand directions, and carry out tasks with reasonable persistence and pace, could respond to others in a one-on-one situation, but would have trouble with crowds, and would have difficulty handling the routine stressors of the workplace.  <u>Id.</u>

    B.    <u>Hearing Testimony</u>.  The Hearing on May 24, 2005, commenced with some opening remarks by the ALJ, in which she noted the appearance of the parties for the Record.  [T. 217].  The ALJ asked the Plaintiff's attorney if he had any objections to the evidence being introduced into the Record, and the Plaintiff's

attorney stated that he did not, and added that the Plaintiff had been seeing Dr. Main, who is a licensed psychologist, and those records were not included in the Administrative Record.  Id.  The ALJ stated that she would leave the Record open for twenty (20) days so that the Plaintiff could submit those records.  [T. 218].

Next, the ALJ asked the Plaintiff's attorney if he had any preliminary remarks, and her attorney stated that he felt that it was significant that Dr. Wiger, who conducted a consultative examination ("CE") of the Plaintiff, commented that he believed she  would have a great deal of difficulty dealing with the ordinary stresses of the work place, and agreed with previous diagnoses of panic disorder, agoraphobia, dysthymia, and depression.  Id.  The Plaintiff's attorney added that Social Security Regulation 85-15 recognized that mental illness is individualized, and supported the Plaintiff's contention that her anxiety with panic disorders made it difficult for her to maintain interpersonal relationships with co-workers and supervisors, and to use public transportation by herself in getting to work.  [T. 219].

The ALJ then swore the Plaintiff to testify, and began her questioning by asking the Plaintiff about her living situation.  Id.  The Plaintiff stated that she lived with her mother, who was retired.  [T. 220].  The Plaintiff added that she had earned her high school diploma through home schooling, as she had been unable to complete high

school due to panic attacks.  Id.  The ALJ asked the Plaintiff what she did during her day, and the Plaintiff stated that she did not have any friends, and spent most of her time in the house reading and watching television.  [T. 221].  In response to the ALJ's question, the Plaintiff testified that she did not drive, and that her mother took care of the house, and did the household shopping.  Id.  The Plaintiff stated that she received her high school diploma with a GPA of approximately 2.8.  Id.

Next, the ALJ asked the Plaintiff what caused her panic attacks, and the Plaintiff stated that she did not know.  Id.  The Plaintiff explained that they had started when she was in the fourth grade, and gradually became worse and turned into anxiety attacks.  [T. 221-22].  The ALJ asked the Plaintiff what she meant, when she stated that crowds were a problem for her, and the Plaintiff explained that, initially, she became nervous when three (3) or four (4) people were around her, and eventually her condition worsened, so that she occasionally was unable to leave the house.  [T. 222].  The Plaintiff testified that her only hobbies were reading, watching television, and playing games on the computer, and that she did not have a boyfriend.  Id.

The ALJ asked the Plaintiff if she had looked for work since she graduated from high school, and the Plaintiff replied that she had but, when she got to the work place, she realized that it was too crowded, and she had a panic attack and was unable to fill

out the application form.  Id.  The Plaintiff explained that she had worked for a while as a home assistant to a woman with multiple sclerosis, and that she was comfortable in that position because the woman was the only other person in the house.  [T. 222-23].

Then the ALJ asked the Plaintiff about her activities of daily living, and the Plaintiff testified that she exercised in the morning by performing aerobics, but that she suffered from panic attacks when she went for walks outside of the house.  [T. 223]. The Plaintiff added that the only help that she gave her mother around the house was mowing the lawn, as her depression made her too tired to help with cleaning.  Id.

Next, the ALJ asked the Plaintiff about her medical history.  Id.  The Plaintiff testified that she had been hospitalized twice for mental problems, with the longest hospitalization lasting one (1) week in 2000, or 2001.  Id.  The Plaintiff explained that depression made it difficult for her to concentrate and made her tired, and also caused her to contemplate committing suicide when she became upset.  Id.  The Plaintiff added that, although her medications had helped her initially, they were no longer improving her condition, and her agoraphobia was becoming worse.  [T. 224].  The ALJ asked the Plaintiff how often she saw her physician, Dr. Mikhail, and she responded that she saw him approximately every three (3) months, and had last seen

him in February or March of 2005.  Id.  The ALJ then noted that she did not have those medical records, and the Plaintiff's attorney agreed to supplement the Record with those treatment notes.  Id.  The ALJ then observed that the last treatment notes, which she had reviewed, stated that the Plaintiff was doing better, and the Plaintiff explained that, initially, she had been doing better and was looking for part-time work, when the medications that she took stopped being beneficial and her symptoms worsened.  [T. 224-25].

The ALJ asked the Plaintiff why she had stopped working for the woman with multiple sclerosis, and the Plaintiff replied that she had only performed that work part-time for approximately one (1) month, and the woman's medical condition had subsequently deteriorated beyond the Plaintiff's ability to care for her.  [T. 225].  The Plaintiff clarified that caring for the woman was the only job that she had ever had, and that she had looked for other work, but had not found an environment that was comfortable for her.  Id.  The ALJ asked the Plaintiff what her ideal job would be, and the Plaintiff replied that she was not sure, but that it would require an environment with few people.  Id.

In response to the ALJ's inquiry, the Plaintiff stated that she did not experience any side effects from her medications, and added that she had no trouble sitting, standing, or walking.  Id.

Next, the Plaintiff's attorney asked her about her education, and the Plaintiff explained that she was home schooled, and had no difficulty doing her homework assignments at her own pace and schedule.  [T. 226].  The Plaintiff's attorney asked her how she traveled to places, and the Plaintiff replied that she did not have a driver's license, and could not take public transportation because of her fear of crowds.  Id. The Plaintiff added that she did not go into stores by herself, including local convenience stores.  [T. 226-27].  The Plaintiff's attorney asked her to comment on her experience of anxiety and panic attacks, and the Plaintiff explained that she became nauseated and dizzy, and would feel weak.  [T. 227].  The Plaintiff added that she had panic attacks when she attended classes at school, especially when she was criticized by a teacher.  Id.  Her attorney then asked her how many people she was comfortable being around, and the Plaintiff stated that she could be around two (2) or three (3) other people if she knew them.  Id.  When asked by her attorney if she could work at a job where she was alone, such as going into an office building and emptying

- 11 -

wastebaskets after working hours, the Plaintiff replied that she could not, as she did not like to be in public places, and only felt safe when she was at home.  [T. 228].

The ALJ then asked the Medical Expert ("ME"), and the Vocational Expert ("VE"), if they had any questions.  Id.  The ME replied that he did not, and the VE asked the Plaintiff if she had ever attended a vocational rehabilitation program.  Id. The Plaintiff replied that she had, but that there were too many people, and she could not complete the program.  Id.  The Plaintiff added that she had undergone a two (2) day evaluation by a social worker, and that, as a result, they recommended that she try to work at a business such as Cub's, or Snyder's, to see if her agoraphobia would dissipate.  [T. 228-29].

The ALJ then swore Mary Ann Johnson ("Johnson"), who is the Plaintiff's mother, to testify.  [T. 229-30].   Johnson testified that the Plaintiff had lived with her since she was born, and that the two of them watched television together, and planted flowers in the yard, but did not go to movies.  [T. 230].  The ALJ asked Johnson if the Plaintiff joined her on shopping trips, and Johnson replied that the Plaintiff would come with her to the grocery store, at times, when it was relatively empty, and that, if the Plaintiff became upset, they would have to leave before finishing their shopping. Id.  The ALJ clarified that the Plaintiff had no other hobbies, and did not perform any

- 12 -

volunteer work.  Id.  The ALJ asked the Plaintiff's attorney if he had any questions for Johnson, and he stated that he did not.  Id.

The ALJ then swore the Medical Expert ("ME") to testify, and asked him to set forth the Plaintiff's impairments as he noted them from the interview, and added that she was primarily concerned with any impairment that existed prior to May 17, 2004. [T. 231].  The ME replied that the Plaintiff had been diagnosed with a depressive disorder in March of 2003, and that a panic disorder, and agoraphobia, were present throughout the Record.  Id.  The ME noted that there was evidence in the Record, from March of 2003, of classic panic symptoms, that the same medical record had noted that the Plaintiff's depression had been getting much worse over the past several months, and that, four (4) years prior to that date, she had been on Paxil[5] and one (1) other medication. [T. 231-32].  The ME added that it was difficult to determine the severity of the Plaintiff's symptoms prior to March of 2002.  [T. 232].

Next, the ALJ asked the ME what limitations he would impose, based upon the Record, and the ME testified that the Plaintiff should work in a very low stress

---

[5]Paxil "is indicated in the treatment of major depressive disorder."  Physicians' Desk Reference, at p. 1503 (60th ed. 2006).

environment, with less than brief and superficial contact with the public, and added that the Plaintiff had no cognitive limitations, as she had strong IQ testing.  Id.

The ALJ then invited the Plaintiff's attorney to ask the ME questions, and the attorney noted that, when the Plaintiff was examined by Dr. Wiger, the doctor reported that she was cooperative, attentive and interested, and did not appear to be defiant, guarded, or defensive.  Id.  The Plaintiff's attorney asked the ME if a standard part of a CE was to place an examinee at ease and make her comfortable, and the ME agreed that this would be the normal practice "to some degree," and added that an examiner would not challenge, or confront the individual being examined.  Id.  The Plaintiff's attorney then asked if a licensed psychologist would be better adapted to make someone feel at ease than an ordinary workplace supervisor in competitive employment, and the ME agreed that such would be the case, and the fact that the Plaintiff got along with the examiner, in a CE, did not mean that she could function equally well in a competitive work situation.  [T. 232-33].  The Plaintiff's attorney then asked the ME if the Plaintiff's GPA provided any indicator of her ability to tolerate stressors, and he responded that it did not.  [T. 233].

Next, the ALJ swore the VE to testify.  Id.  The ALJ asked the VE if she wanted to make any changes in her report, and the VE stated that she did not.  Id.  The ALJ

then posed a hypothetical to the VE, in which she asked the VE to assume an individual who was twenty-one (21) years of age, with no exertional limitations, no prior relevant work experience, who took a number of medications with no side effects, was impaired with an effective mood disorder, panic with agoraphobia, and who was limited to work in which she would not come into contact with crowds of individuals, have no public contact, and only intermittent contact with co-workers and supervisors. [T. 233-34]. The ALJ added that the ideal work setting for the individual would be one in which she could work alone or with one (1) other person, in a low stress environment, where minimal industrial standards for production and pace were applicable. [T. 234]. Under the assumptions of that hypothetical, the ALJ asked the VE if there was any work in the regional or national economy for such an individual. Id.

The VE replied that she believed that the individual could perform work as a cleaner on a second or third shift, working alone, or in small groups of one (1) or two (2) other people, and noted that there were approximately 10,000 such jobs available. Id. The VE added that another possibility would be a "short demonstration" position, in which the individual would be seated next to another person, but would be performing work on her own, and noted that those were the easiest jobs available. [T.

- 15 -

234-35].  The VE explained that those jobs included assembly, with approximately
8,250 positions available, and inspection packaging, with 1,500 positions in the
regional economy.  [T. 235].

Next, the Plaintiff's attorney asked the VE how many of the positions, that she
had identified, involved work in which the individual was not in proximity of others,
and the VE replied that there were no jobs, at the unskilled level, in which the individual
worked completely alone, but that the positions that she had listed were those in which
the individual would have the least amount of contact with others.  [T. 235-36].  The
Plaintiff's attorney then asked the VE to confirm that the positions she had suggested
were those that anyone could perform, and the VE agreed that this was the case.  [T.
236].  The Plaintiff's attorney then asked if it was true that, under those circumstances,
supervisors would not be deferential to the employees, and would not provide special
supervision, but would, instead, expect employees to have the ability to sustain an
ordinary routine without any special accommodations, and the VE replied that those
positions would not afford special supervision.  [T. 236-37].

The ALJ then asked the Plaintiff if she wished to make a closing statement, and
she declined.  [T. 237].  The Plaintiff's attorney then posed a question to the ME, and
asked if it would create stressors for an individual to be employed in a position that

was significantly below the individual's intellectual ability.  Id.  The ME replied that it was difficult to generalize an answer to that question, and the Plaintiff's attorney suggested that someone, who held a GPA of 3.8, could have difficulties with boredom, and tedium, in a position that was so easy that it could be performed by anyone.  [T. 237-38].  The Plaintiff's attorney further asserted that the Plaintiff was unable to tolerate the stressors of the workplace, was unable to sustain an ordinary routine without special supervision, and was unable to work in coordination with, or in proximity to others, without being distracted by them.  He further urged that the Plaintiff was unable to complete a normal work day without interruptions for psychological-based symptoms, was unable to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers, and to travel to unfamiliar places or use public transportation.  [T. 238-39].

The ALJ concluded the Hearing by thanking the parties and noting that she would hold the Record open for twenty (20) days pending the receipt of additional medical records, at which time, she would review the Record and make her decision. [T. 239].

C.      The ALJ's Decision.  The ALJ issued her decision on October 14, 2005.

[T. 14-22].   As she was required to do, the ALJ applied the sequential, five-step

analytical process that is prescribed by 20 C.F.R. §§416.920.[6]  As a threshold matter,

the ALJ noted that, on April 15, 2003, the Plaintiff had filed a protective application

for CDB, and on May 2, 2003, had filed an application for SSI.  [T. 14].  The ALJ

concluded that the Plaintiff had not engaged in substantial gainful activity since her

alleged onset date of May 18, 1982.  [T. 16].

Next, the ALJ examined whether the Plaintiff was subject to any severe mental

impairments, which would substantially compromise her ability to engage in work

activity.  Id.   After considering the Plaintiff's medical history, which included the

reports of the Plaintiff's treating physicians, and the testimony adduced at the Hearing,

---

[6]Under the five-step sequential process, the ALJ analyzes the evidence as
follows:

> (1) whether the claimant is currently employed; (2) whether
> the claimant is severely impaired; (3) whether the impairment
> is, or is comparable to, a listed impairment; (4) whether the
> claimant can perform past relevant work; and if not, (5)
> whether the claimant can perform any other type of work.

Cox v. Barnhard, 345 F.3d 606, 607 n.1 (8th Cir. 2003).

the ALJ found that the Plaintiff was severely impaired by a history of a depressive disorder, and a panic disorder with agoraphobia.  Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with those contained in Appendix 1, Subpart P, of the Regulations.  See, 20 C.F.R. §416.920(d)..  The ALJ determined that the Plaintiff's physical impairments did not meet, or equal, the criteria of any Listed Impairment, based upon the testimony of the ME, and the Record as a whole.  [T. 17].

The ALJ then proceeded to determine whether the Plaintiff retained the "residual functional capacity" ("RFC") to engage in work which existed in significant numbers in the national economy.  Id.  RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks.  See, Title 20 C.F.R. §416.945.  The ALJ recognized that, in order to arrive at the Plaintiff's RFC, she was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) and Title 20 C.F.R. §416.920(a).

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians; the opinions of the impartial

ME; the objective medical evidence; and the Plaintiff's subjective complaints; the ALJ

determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has the residual functional capacity to
> perform work that does not involve crowds or public
> contact; with only intermittent contact with co-workers and
> supervisors; preferably in a setting where the claimant
> would work alone; and performing tasks that are low stress
> in nature, with minimal standards for production and pace.

Id.

In determining the Plaintiff's RFC, the ALJ evaluated the mental impairments using the

procedures set out in 20 C.F.R. §416.920.  Id.  The ALJ noted that she had carefully

considered the entire Record, including the testimony of the Plaintiff, and found that

the Plaintiff would experience moderate restrictions in activities of daily living.  Id.

As explained by the ALJ, the Plaintiff responded to an activities of daily living

questionnaire by stating that she cleaned her house, did yard work, went shopping with

her mother, read, babysat her nephew, watched television, fixed things, groomed and

bathed herself, played games, visited relatives, talked on the telephone and to

neighbors, and paid bills and handled finances.  Id.  In addition, during the CE, the

Plaintiff reported that she cut the grass, went for walks, spent time on her computer,

and read a book per day.  Id.

The ALJ further found that the Plaintiff would experience marked restrictions in social functioning.  [T. 18].  The ALJ considered the treatment notes of Dr. Mikhail from March of 2003, that the Plaintiff was happy and interactive, and the notes from a psychological examination by Dr. Wiger, who found the Plaintiff to be cooperative, attentive and interested during his examination, and not guarded or evasive.  Id.  Dr. Wiger reported that the Plaintiff was able to respond to people individually, but would have difficulty in crowds.  Id.

The ALJ additionally determined that the Plaintiff would experience moderate restrictions in maintaining concentration, persistence, and pace.  Id.  The Plaintiff reported that she read a book per day, and Dr. Wiger stated that the Plaintiff's thought process was coherent, logical, goal directed and relevant, and that she could perform serial sevens, could recall six (6) digits forward, and four (4) digits backwards, and had adequate concentration.  Id.  According to Dr. Wiger, the Plaintiff had a verbal IQ of 103, a performance IQ of 86, and a full scale IQ of 96, appeared to be quite intelligent, was able to carry out directions, and was capable of carrying out mental tasks with adequate persistence and pace, but might have problems handling the stressors of the work place.  Id.  In addition, the ALJ observed that there was no

evidence in the Record that the Plaintiff had experienced any episodes of decompensation.  Id.

The ALJ referenced Dr. Main's statement, in a letter dated September 1, 1998, that the Plaintiff reported ongoing symptoms of agoraphobia, and significant anxiety symptoms, when she was in public, and he further noted that the Plaintiff's father had recently had a heart attack, and that the Plaintiff, and her family, were entirely restricted to the family home.  Id.  Dr. Main added that the Plaintiff, and her mother, were not interested in pursuing psychotherapy, or medication intervention, and they seemed completely comfortable with the idea of having the Plaintiff live at home for the rest of her life.  Id.  In a discharge summary, which was dated September 15, 1998, Dr. Main recorded that the Plaintiff was experiencing only mild symptoms that were secondary to her panic disorder with agoraphobia, and had a GAF score of 65.  Id.

In treatment notes from March of 2003, Dr. Mikhail stated that the Plaintiff reported that her anxiety, and depression, had been getting worse, and that she had been experiencing panic attacks and was afraid to leave her house.  Id.  The Plaintiff's social worker, Close, recorded in April of 2003, that the Plaintiff was experiencing ongoing symptoms of agoraphobia, and reported experiencing an increase in her energy level, and the elimination of her suicidal thoughts, with the use of medication.

Id.  Close additionally noted that the Plaintiff would continue to work with Dr. Mikhail to treat her agoraphobia, and stated that, although the Plaintiff requested to have SSI paperwork completed, he believed that vocational rehabilitation might be an option for her in the future.  [T. 18-19].

Dr. Mikhail saw the Plaintiff in April of 2003, and stated that the Plaintiff was doing "wonderful" on Celexa, was feeling better, and seemed happy and interactive. [T. 19].  Dr. Mikhail added that the Plaintiff's mother was trying to get SSI for the Plaintiff, and he did not disclose whether he supported that pursuit, but did explain that he was looking into counseling for the Plaintiff.  Id.

In treatment notes from May of 2003, Close stated that the Plaintiff continued to take Celexa, and that both the Plaintiff, and her mother, reported a noticeable and sustained difference in her mood and functioning, and that the Plaintiff denied any suicidal thoughts.  Id.  Close observed that the Plaintiff's condition was stable, and that her visits could be scheduled on an as-needed basis.  Id.  In June of 2003, Dr. Mikhail reported that the Plaintiff's depressive disorder was in partial remission and that she was very stable.  Id.

Dr. Wiger performed a CE of the Plaintiff, and observed that she appeared to be somewhat shy, but did not appear to be depressed, anxious, irritable, or angry, and

noted her statement that she was not depressed at the time of the CE.  Id.  In addition,

Dr. Wiger recorded that the Plaintiff had a verbal IQ of 103, a performance IQ of 86,

and a full scale IQ of 96, and appeared to be quite intelligent.  Id.  According to Dr.

Wiger, the Plaintiff was not taking any medication for her anxiety, and had not received

any counseling on an ongoing basis, and he opined that mental health treatment could

make a significant difference in her life.  Id.  Dr. Wiger also noted that he believed the

Plaintiff was capable of carrying out mental tasks with adequate persistence and pace,

but that she might have problems handling work place stressors.  Id.

In treatment notes from January of 2004, Dr. Mikhail stated that the Plaintiff had

been taking Paxil for the past six (6) months, was doing very well, and reported that

her life was much improved, as she could leave her house, and had applied for a job

working four (4) hours a day.  Id.  Dr. Mikhail saw the Plaintiff in November of 2004,

and stated that the Plaintiff was doing remarkably well on Celexa, was leaving the

house and working part time, and he concluded that she was capable of carrying out

a low functioning job.  Id.

The ALJ observed that, although the Plaintiff alleged that she was disabled due

to depression, and a panic disorder with agoraphobia, the Record documented that

her condition had improved with the use of medication, that her condition was stable,

- 24 -

that she had reported to her psychologist that her life was markedly improved, and that she was working part time.  <u>Id.</u>  Further, the ALJ noted that there was no objective psychological evidence in the Record that documented the Plaintiff's claims of disabling psychological symptoms, and that the Plaintiff's treating psychologist, Dr. Mikhail, had concluded that the Plaintiff was capable of carrying out a low functioning job.  <u>Id.</u>  Consequently the ALJ found that the Plaintiff's subjective complaints were not entirely credible.  [T. 20].

In reaching her decision, the ALJ considered the opinions of the State Agency physicians who had reviewed the Record, and gave them some weight since they agreed with the ALJ's assessment that the Plaintiff was capable of working.  <u>Id.</u>  The ALJ did not adopt those opinions, however, as she further reduced the Plaintiff's RFC to accommodate the effects of her subjective complaints.  <u>Id.</u>

The ALJ also considered the opinion of the ME, but did not give it significant weight, as it appeared to be based largely on the Plaintiff's testimony at the Hearing, and not on the objective evidence in the Record, and because it was inconsistent with the other medical opinions in the Record, including the opinion of the Plaintiff's psychiatrist, that the Plaintiff was doing well and was capable of working.  <u>Id.</u>

Finally, the ALJ considered the opinion of Dr. Wiger, who stated that the Plaintiff had a GAF of 50, but declined to give that opinion significant weight as it was inconsistent with Dr. Wiger's own statements, in his CE report, that the Plaintiff was capable of understanding and following directions, responding to other people on an individual basis, and carrying out tasks with reasonable persistence and pace. Id. The ALJ added that the proposed GAF score was not given significant weight as it was a reflection of the Plaintiff's functioning at one point of time, was not reflective of the Plaintiff's functioning over a period of time, and the score was intended to serve a diagnostic function, rather than enable disability determinations. Id.

The ALJ stated that the Plaintiff's activities of daily living were inconsistent with total disability, and that, although the Plaintiff took several medications to treat the symptoms of her impairments, nothing in the Record suggested that she had reported any ongoing side effects from those medications to her treating physicians, and she did not report any side effects at the Hearing. Id. The ALJ referenced the Plaintiff's testimony, that she worked a few hours a week for a woman who needed help in her home, and had reported to her psychologist that she had started working part time, and she observed that the Plaintiff's failure to perform significant ongoing work

activity suggested that she might not be interested in seeking any substantial gainful employment.  [T. 20-21].

Proceeding to the Fourth Step, the ALJ found that the Plaintiff had no past relevant work, was a younger individual with a high school education who could communicate in English, and was capable of performing jobs that existed in significant number in the national economy.  Id.  Specifically, the ALJ noted that the VE had testified that the Plaintiff could work as a janitor/cleaner, with 10,000 positions available, an assembler, with 1,000 positions available, or a packager, with 1,000 positions available in the regional economy.  Id.  Thus, the ALJ found that the Plaintiff was not entitled to CDB, or SSI.  [T. 22].

## IV.  Discussion

A.    Standard of Review.    The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal

Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951). Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed. See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998). On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied. See, Loving v. Secretary of Health and Human Services, 16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001). Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006).

Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 412 F.3d 924, 927 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).   Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because

we would have decided the case differently.'"), quoting <u>Holley v. Massanari</u>, 253 F.3d

1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore,

is deferential, and we neither reweigh the evidence, nor review the factual Record <u>de</u>

<u>novo</u>.  See, <u>Hilkemeyer v. Barnhart</u>, 380 F.3d 441, 445 (8th Cir. 2004); <u>Flynn v.</u>

<u>Chater</u>, 107 F.3d 617, 620 (8th Cir. 1997); <u>Roe v. Chater</u>, 92 F.3d 672, 675 (8th Cir.

1996).

   B. <u>Legal Analysis</u>.  In support of her Motion for Summary Judgment, the

Plaintiff advances the following arguments:

     1. That the ALJ Erred in Finding that the Plaintiff's
       Impairments Did Not Meet the Criteria Contained in
       Sections 12.04, and 12.06, of the Listings; and

     2. That the Hypothetical Propounded to the VE was
       Improper.

See, <u>Plaintiff's Memorandum</u>, <u>Docket No. 13</u>.

We address each contention below.

     1. <u>Whether the ALJ Erred in Finding that the Plaintiff's</u>
       <u>Impairments Did Not Meet the Criteria Contained in</u>
       <u>Sections 12.04, and 12.06, of the Listings</u>.

      a. <u>Standard of Review</u>.  The Commissioner's Listing of

Impairments describes those impairments that the Commissioner considers "to be

severe enough to prevent an individual from doing any gainful activity, regardless of

his or her age, education, or work experience."  20 C.F.R. §416.925(a).  The Listings

applicable here, Sections 12.04 and 12.06, consist of a statement describing the

disorders addressed by the listing -- i.e, the paragraph A criteria, which serve as a set

of medical findings -- paragraph B criteria, which detail a set of impairment-related

functional limitations, and additional paragraph C criteria.   See, 20 C.F.R. §404,

Subpart P, Appendix 1, Section 12.00.  The Regulations provide that a claimant has

a Listed Impairment "if the diagnostic description in the introductory paragraph and

the criteria of both paragraphs A and B * * * of the listed impairment are satisfied."

Id.

    The  Section  12.04  Listings  describe  affective  disorders,  which  are

"[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or

depressive  syndrome."   Id.   The paragraph A criteria of Section 12.04 require

medically  documented  intermittent  or  continuous  persistence  of  a  variety  of

symptoms,  including depressive syndrome, manic syndrome, or bipolar syndrome.

Id.  In turn, the Section 12.06 Listings encompass anxiety related disorders, in which

"anxiety is either the predominant disturbance or it is experienced if the individual

attempts to master symptoms."  Id.  The paragraph A criteria of Section 12.06 require

a  finding   of  generalized  persistent  anxiety,  a  persistent  irrational  fear  of  a  specific

object or activity, recurrent severe panic attacks, recurrent obsessions or compulsions, or recurrent memories of a traumatic experience.  Id.  In order to satisfy the Listings criteria for either Sections 12.04, or 12.06, the paragraph A symptoms must result in at least two (2) of the following paragraph B criteria:

1.   Marked restriction of activities of daily living; or

2.   Marked difficulties in maintaining social functioning; or

3.   Marked difficulties in maintaining concentration, persistence, or pace; or

4.   Repeated episodes of decompensation, each of extended duration.

Id.; see Pratt v. Sullivan, 956 F.2d 830, 834-35 (8th Cir. 1992)(describing procedure for evaluating mental impairments using A and B criteria); see also, Hilkemeyer v. Barnhart, 380 F.3d 441, 446 (8th Cir. 2004).

Using these standards as our guide, we proceed to analyze the Plaintiff's arguments.

b.   Legal Analysis.  As noted, the Plaintiff claims that the ALJ erred in declining to find that her impairments met, or equaled, the Listings of Sections 12.04 or 12.06.  We disagree, and find that, in arriving at her decision, the ALJ carefully considered all of the medical evidence in the Record, and that evidence supports her rejection of a Listings Impairment.

In her decision, the ALJ found that the Plaintiff would experience moderate restrictions in daily living. [T. 17]. In arriving at that assessment, the ALJ considered the Plaintiff's responses to an activities of daily living questionnaire, in which she stated that she was able to clean house, perform yard work, go shopping with her mother, read, babysit, watch television, fix things, groom and bathe herself, play games, visit relatives, talk on the telephone and with her neighbors, and handle finances. Id. The ALJ additionally determined that the Plaintiff would be markedly restricted in social functioning after considering treatment notes by Dr. Mikhail, the Plaintiff's treating physician, that stated that the Plaintiff was happy and interactive, and a CE by Dr. Wiger, who found that, although the Plaintiff was cooperative and attentive, she would have difficulty in crowds. [T. 18]. Finally, the ALJ found that the Plaintiff would only experience moderate restrictions in maintaining concentration, persistence and pace, and based that assessment on the CE performed by Dr. Wiger. Id. As noted by the ALJ, Dr. Wiger found that the Plaintiff's thought processes were coherent, her concentration was adequate, and her memory "pretty good," and he opined that the Plaintiff was capable of carrying out mental tasks with adequate persistence and pace, although she might have problems handling the stressors of the

work place.  Id.  The ALJ finally found that the Plaintiff had experienced no episodes

of decompensation.  Id.

The Plaintiff argues that the ALJ should have given significant weight to the

ME's testimony for, at the Hearing, the ME testified that the Plaintiff's impairments

met the requirements for paragraph A of Sections 12.04 and 12.06 of the Listings, and

further stated that the Plaintiff would experience marked difficulties in maintaining

social functioning, and in maintaining concentration, persistence and pace, which

would satisfy the paragraph B criteria for both Listings.  [T. 231].

In order to assist her in a determination of the appropriate RFC, the ALJ is

expressly permitted to elicit the testimony of an ME, "who does not examine the

claimant but who hears and reviews the medical evidence and who may offer an

opinion."   Richardson v. Perales, 402 U.S. 389, 396 (1971); see, 20 C.F.R.

§416.927(a)(2); see also, Hacker v. Barnhart, 459 F.3d 934, 939 (8th Cir. 2006)("It is

also well settled that an ALJ may consider the opinion of an independent medical

advisor as one factor in determining the nature and severity of a claimant's

impairment."), citing Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir. 2004).  "The

opinion of such an advisor, even if different from that of an examining physician, may

constitute substantial evidence to support a finding of nondisability."  Janka v. Sec'y

of Health, Ed. and Welfare, 589 F.2d 365, 369 (8th Cir. 1978).

Nonetheless, as would be true with any treating or consulting physician, the ALJ

is not obligated to accept a medical opinion which is, for example, conclusory, or

inconsistent with the substantial evidence in the record.  See, Charles v. Barnhart, 375

F.3d 777, 784 (8th Cir. 2004)("conclusory and unsupported by medical findings");

Hacker v. Barnhart, supra at 939 ("inconsistent with substantial evidence in the

record").  Ultimately, "[i]t is the ALJ's function to resolve conflicts among the

opinions of various treating and examining physicians."  Pearsall v. Massanari, supra

at 1218-19, citing Jenkins v. Chater, 76 F.3d 231, 233 (8th Cir. 1996); Estes v.

Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Bentley v. Shalala, 52 F.3d 784, 785-87

(8th Cir. 1995).

Here, the ALJ considered the opinion of the ME -- that the Plaintiff would

satisfy the Listings criteria for Sections 12.04 and 12.06 -- and declined to give that

opinion significant weight as it appeared to be largely based upon the Plaintiff's

Hearing testimony, and not upon the objective evidence in the Record.  [T. 20].

Additionally, the ALJ noted that the ME's opinion was contradicted by other medical

opinions in the Record, including the opinion of the Plaintiff's psychiatrist that the

Plaintiff was doing well, and was capable of working.  Id.  The Plaintiff argues that the ME's opinion should be given more weight, as he was the only medical expert who had access to all of the Plaintiff's medical records.  See, Plaintiff's Memorandum in Support, supra at p. 8.

However, the State Agency physician reviewed the Plaintiff's records through August of 2003, and the only medical records, which were not available to him at that time, and that were reviewed by the ME, were the reports of Dr. Mikhail from January of 2004, and November of 2004, in which he found that the Plaintiff was doing "remarkably well," was capable of leaving the house, and was working at a part-time job -- all clinical observations which were inconsistent with those of the ME.  [T. 179-80].  The ALJ, and not the ME, is charged with assessing the credibility of the witnesses.  If, as the ALJ found, the ME was largely relying upon the Plaintiff's Hearing testimony, uncritically acceding to the ME's opinion would effectively undercut the ALJ's sole responsibility to make believability findings.

Of course, it is the ALJ's function to resolve conflicts in the medical evidence, and we find no error in the ALJ's decision to reject that portion of the ME's opinion that was not supported by the Plaintiff's medical findings, and the Record as a whole, and to ultimately conclude that the Plaintiff's impairments did not meet or equal the

Listed Impairments in Sections 12.04 or 12.06.  The ALJ's decision was well within

the "zone of choice."  See, Nicola v. Astrue, 480 F.3d 885, 886 (8th Cir. 2007)("We

will disturb the ALJ's decision only if it falls outside the available 'zone of choice,'

and "[a]n ALJ's decision is not outside the 'zone of choice' simply because we might

have reached a different conclusion had we been the initial finder of fact."), citing

Hacker v. Barnhart, supra at 936; Travis v. Astrue, 477 F.3d 1037, 1042 (8th Cir.

2007)("As there is conflicting evidence on the record, the ALJ's determination that the

physicians' opinions were not supported by objective evidence does not lie outside

the available zone of choice.).

    2. Whether the Hypothetical Propounded to the VE Was Improper.

     a. Standard of Review.  In determining the Plaintiff's RFC, and

in framing an appropriate hypothetical for a VE, the ALJ need only include the

limitations she accepted, as supported by substantial evidence.  See, Pertuis v. Apfel,

152 F.3d 1006, 1007 (8th Cir. 1998); Rappoport v. Sullivan, 942 F.2d 1320, 1323 (8th

Cir. 1991).  However, when an ALJ finds that a Plaintiff suffers from impairments, the

hypothetical posed to the VE must include those impairments.  See, Brachtel v. Apfel,

132 F.3d 417, 421 (8th Cir. 1997); Newton v. Chater, 92 F.3d 688, 694-95 (8th Cir.

1996)("A hypothetical question must precisely describe a claimant's impairments so

that the vocational expert may accurately assess whether jobs exist for the claimant."),

citing Smith v. Shalala, 31 F.3d 715, 717 (8th Cir. 1994); Stout v. Shalala, 988 F.2d

853, 855 (8th Cir. 1993).

The facts in the hypothetical are designed to replicate the Plaintiff's RFC, so as

to allow the VE to identify jobs in the economy, if any there be, which an individual,

with functional limitations like those of the Plaintiff, would be able to perform.  See,

Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); Cline v. Sullivan, 939 F.2d

560, 565 (8th Cir. 1991).   Moreover, it is well-settled that the testimony of a VE, which

is based upon a properly-phrased hypothetical question, constitutes substantial

evidence.  See, e.g., Howard v. Massanari, supra at 582; Warburton v. Apfel, 188

F.3d 1047, 1049 (8th Cir. 1999); Porch v. Chater, 115 F.3d 567, 571 (8th Cir. 1997).

In order to rely upon a VE's opinion, however, the hypothetical posed "must fully set

forth a claimant's impairments."  Sullins v. Shalala, 25 F.3d 601, 604 (8th Cir. 1994),

citing Totz v. Sullivan, 961 F.2d 727, 730 (8th Cir. 1992).

b.    Legal Analysis.  The Plaintiff argues that the ALJ's

hypothetical was flawed because it did not accurately describe the limitations that were

imposed by the Plaintiff's impairments.  We have already determined that the ALJ

thoroughly reviewed the Record so as to ascertain that the Plaintiff's symptoms from

her mental health impairments, including depression, anxiety, and agoraphobia, were insufficient to render the Plaintiff disabled, and we have also found that the ALJ did not err in declining to give substantial weight to the opinion of the ME in finding that the Plaintiff's impairments did not satisfy the Listings criteria.   Therefore, it was appropriate for the ALJ to  only include, in her hypothetical to the VE, the limitations that she determined to be supported by substantial evidence.  See, <u>Pertuis v. Apfel</u>, supra at 1007; <u>Rappoport v. Sullivan</u>, supra at 1323.

The hypothetical posed to the VE included the Plaintiff's education, work experience,  and physical and mental work-related limitations, which were consistent with the Record; namely, no exertional limitations, impairment by effective mood disorder, panic with agoraphobia, work limited to no contact with crowds or the public and minimal contact with co-workers or supervisors, and in a low stress environment with minimal industrial standards for production and pace.  [T. 233-34]. The VE testified that the hypothetical individual, who was subject to such limitations, could perform work as a second or third shift cleaner, or a short demonstration assembly position.  [T. 234].

Accordingly, the ALJ's finding, that the Plaintiff was not disabled because there were positions available in the national and regional economy, was supported by

substantial evidence in the Record as a whole.  See, <u>Haggard v. Apfel</u>, 175 F.3d 591, 595 (8th Cir. 1999)("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.'"), quoting <u>Roberts v. Heckler</u>, 783 F.2d 110, 112 (8th Cir. 1985); <u>Andres v. Bowen</u>, 870 F.2d 453, 455 (8th Cir. 1989).  Nor is there anything, in the materials submitted subsequent to the Hearing, which would warrant a different result.  Therefore, finding no error in this, or in any other aspect of the ALJ's decision, that has either been drawn to our attention, or uncovered by our independent review, we recommend that the Defendant's Motion for Summary Judgment be granted, and that the Plaintiff's cross-Motion be denied.

NOW, THEREFORE, It is –

RECOMMENDED:

1.      That the Plaintiff's Motion [Docket No. 12] for Summary Judgment be denied.

2.      That the Defendant's Motion [Docket No. 15] for Summary Judgment be granted.

Dated:  July 11, 2007                    s/Raymond L. Erickson

                                         Raymond L. Erickson
                                         CHIEF U.S.  MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **July 28, 2007**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **July 28, 2007**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.